**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HAITHAM J. KOUSA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) |
| QINAN JI, ZHIQIANG WANG, LAWRENCE W. LEIGHTON, FRANK WAUNG, YANG XIANG DONG, CHINA NATURAL GAS, INC. and THE NASDAQ STOCK MARKET LLC, | ) No. _____ ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) |
| CHINA NATURAL GAS, INC., | ) ) |
| Nominal Defendant. | ) |

**VERIFIED SHAREHOLDER CLASS ACTION AND
DERIVATIVE COMPLAINT FOR EQUITABLE RELIEF**

Plaintiff Haitham J. Kousa ("Dr. Kousa") by and through his undersigned counsel, alleges upon personal knowledge as to himself, and upon information and belief (including the investigation of counsel and review of publicly available information) as to all other allegations, as follows:

**OVERVIEW OF THE ACTION**

1.      This case arises from a pattern of financial impropriety and self-dealing at China Natural Gas, Inc. ("CHNG" or the "Company") that caused a more than 80% run-down in the value of the Company's shares, has prompted an investigation by the Securities and Exchange Commission ("SEC"), and now threatens the Company and its shareholders with irreparable harm from the imminent delisting of its shares from the NASDAQ Global Market.

2.      On September 21, 2011, the Company disclosed that the Chairman of the Board of Directors and then-Chief Executive Officer ("CEO"), Qinan Ji ("Ji"), aided by other officers of the Company, caused CHNG to engage in undisclosed related-party loans that funneled millions of dollars of Company money to Ji's relatives and affiliates (the "Related Party Loans").  The NASDAQ Stock Market LLC ("NASDAQ") halted trading in CHNG shares the same day.

3.      Disclosure of the Related Party Loans followed disclosure of numerous other instances of unauthorized transactions by management, self-dealing, and violations of generally accepted accounting principles ("GAAP") under Ji's leadership during the previous 18 months, leading analysts to repeatedly question the Company's governance and driving an over 80% decline in the Company's stock price, erasing over $180 million in shareholder value, including an over $450,000 loss for Dr. Kousa.

4.      The admitted misconduct by management included (i) Ji's receipt of a $19.6 million payment in connection with the Company's acquisition of Lingbao Yuxi Natural Gas Co., Ltd. (the "Yuxi Acquisition"), (ii) management's issuance of loans totaling approximately $14.3 million to third parties without approval by the Company's Board of Directors (the "Board"), (iii) management's acquisition of businesses and assets totaling $14.1 million without Board approval, and (iv) the Company's failure to disclose a $17.7 million loan – representing a more than 50% increase in the Company's outstanding debt – in the applicable Form 10-Q and other SEC filings.

5.      Following the Company's disclosure of these acts of self-dealing and mismanagement in a series of announcements through 2010, Ji instituted a near-blackout on news regarding the major growth initiatives at the Company in early 2011, most

significantly the progress and status of CHNG's liquefied natural gas production facility (the "LNG Plant"), in which the Company had invested nearly $70 million.  The absence of meaningful disclosures by the Company reversed its prior practice of detailed discussion of the status of the LNG Plant and other initiatives, further undermining investor confidence and impairing the trading price of its stock.

6.      On June 30, 2011, Ji signaled his intention to exit the U.S. public markets, announcing a going-private offer (the "Proposed Transaction") for the Company at $4.25 per share – a deep discount to the Company's trading price earlier in the year, thereby capitalizing on the concerns about management integrity that had resulted from his own conduct.  The offer was made days after the undisclosed accomplishment of a key milestone for the Company – the commencement of regular production at the LNG Plant.

7.      Despite previous repeated instances of self-dealing and other governance failures over more than a year, the Board responded to disclosure of Related Party Loans on September 21, 2011 by installing as CEO a long-time Company employee and Ji associate, Shuwen Kang ("Kang"), and retaining Ji as Chairman, with no change in compensation.

8.      On November 9, 2011, the Company disclosed that it would not timely file its Form 10-Q for the prior quarter because it had recently dismissed its U.S. counsel, Proskauer Rose LLP.  The Company's Delaware counsel, who had previously been representing CHNG in negotiations concerning a books and records demand served by Dr. Kousa, also advised the undersigned counsel that they were no longer representing the Company.

9.      On November 14, 2011, the Company disclosed the existence of an SEC investigation into the Yuxi Acquisition and the Related Party Loans.

10.     On November 15, 2011, the Company disclosed that NASDAQ had determined to delist the Company's stock, specifically based on the Related Party Loans and related disclosure and internal control deficiencies.

11.     The Company thus now faces the prospect of the imminent delisting of its shares – and outcome that would irreparably harm the Company, Dr. Kousa and other shareholders by largely destroying the remaining value of CHNG shares and eliminating the liquidity provided by the NASDAQ listing.

12.     In light of the nature of the Related Party Loans and the prior instances of self-dealing by Ji and other governance failures, the Board's decision to replace Ji with a long-time Company insider with close ties to Ji and retain Ji as Chairman of the Company in the face of threatened delisting by NASDAQ constitutes gross mismanagement or willful misconduct by the Board.

13.     Accordingly, Dr. Kousa's application for appointment of a temporary receiver and injunctive relief in aid thereof should be granted.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff does not reside in the same state as any of the Defendants.

15.     In addition, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because NASDAQ is a self-regulatory

organization whose rules and by-laws with respect to the listing and delisting of securities are governed by Sections 15A and 19 of the Exchange Act, 15 U.S.C. §§ 78o-3 and 78s.

16.     Venue is proper in this District under 28 U.S.C. § 1391(c) because CHNG is incorporated in the State of Delaware.

17.     This action is not a collusive one to confer jurisdiction on this Court.

## PARTIES

18.     Dr. Kousa is a physician residing in Ohio.  From November 8, 2007 to February 18, 2009, Dr. Kousa purchased 52,857 shares of CHNG common stock at a total cost of $734,454, and retains ownership of those shares.  At $1.93, the last CHNG trading price prior to the halt of trading on September 21, 2011, Dr. Kousa's losses totaled $632,440 – over 85% of his investment.  Due to the trading halt, Dr. Kousa's entire investment in CHNG is now illiquid and of unknown value.

19.     CHNG is a Delaware corporation, with its registered agent located at National Corporate Research, Ltd., 615 South Dupont Highway, Dover, Delaware, 19901, and its Principal Executive Offices located at 19th Floor, Building B, Van Metropolis, 35 Tang Yan Road, Hi-Tech Zone, Xi'an, 710065, Shaanxi Province, China.

20.     CHNG carries on its operations through its wholly owned subsidiary Xilan Natural Gas Equipment Co., Ltd and its 100% variable interest entities ("VIE"), Xi'an Xilan Natural Gas Co. Ltd. ("Xi'an Xilan"), Shaanxi Jingbian Liquefied Natural Gas Co., Ltd., Xian Xilan Auto Bodyshop Co., Ltd., Henan Xilan Natural Gas Co., Ltd., and Lingbao Yuxi Natural Gas Co., Ltd.

21.     Defendant Qinan Ji is Chairman of CHNG's Board, a position he has held since 2005.  Ji also served as CHNG's CEO from May 2006 through October 4, 2011.

22.     Defendant Zhiqiang Wang ("Wang") is Vice Chairman of the Board, a position he has held since 2006.  Wang is a member of the Board's Audit Committee.

23.     Defendant Yang Xiang Dong, also known as "Donald Yang" ("Yang"), is a member of the Board, a position he has held since August 2008.  Yang is also the founding partner and, since 2007, the president of Abax Global Capital ("Abax"), which purports to be "a leading Hong Kong based asset management firm focused on Asian public and private investments especially in Greater China."

24.     Defendant Frank Waung ("Waung") is a member of the Board, a position he has held since November 25, 2010.  Waung is a member of the Board's Audit Committee.

25.     Defendant Lawrence W. Leighton ("Leighton") is a member of the Board, a position he has held since August 2008.  Leighton is a member of the Board's Audit Committee.

26.     Collectively, the individual Defendants are referred to herein as the "Director Defendants."

27.     Non-party Shuwen Kang has been CHNG's CEO since October 4, 2011.  According to the Company's October 12, 2011 Form 8-K filing:  "Most recently from 2011, Mr. Kang has been vice president of [Xi'an Xilan], the variable interest entity of one of the Company's major subsidiaries, and is in charge of Xi'an Xilan's business operations.  From 2006 to 2010, Mr. Kang served as senior counsel to Xi'an Xilan, responsible for making strategic and business development plans for the Company."

28.     The NASDAQ Stock Market LLC is Delaware limited liability company with its Principal Executive Offices located at One Liberty Plaza, New York, New York

10006.  NASDAQ operates the registered national securities exchange upon which CHNG's shares are listed.

## FACTUAL BACKGROUND

**A.    CHNG's Business and Entry in the U.S.
Public Markets via a Reverse Merger**

29.    CHNG is an integrated natural gas operator in the Peoples' Republic of China ("China"), primarily involved in the distribution of compressed natural gas ("CNG"), through the CNG fueling stations owned by its VIE affiliate, Xi'an Xilan.  In addition, CHNG recently completed and brought online the LNG Plant, a major project that the Company and analysts had cited as a key growth driver, and in which the Company had invested more than $68 million – more than the entire equity value of the Company at its last trading price.

30.    As reported in its most recent Form 10-Q, the Company has recorded significant growth over the past year.  For the quarter ended September 30, 2011, the Company's revenue was $36.9 million, an increase of 65% over the same period a year earlier, and income from operations grew to $7.0 million, an increase of 75% over the same period a year earlier.

31.    CHNG became a U.S. public company in December 2005 through a "reverse merger" – a process in which a publicly traded shell company merges with a private company seeking to become publicly traded, resulting in the shareholders of the former private company acquiring ownership of the public company.

32.    Reverse mergers allow the private company to be listed on a U.S. stock exchange without undergoing the regulatory scrutiny and mandatory public disclosures that are required in an initial public offering, and the SEC has recently raised significant

concerns regarding governance at companies based in China that, like CHNG, have

became publicly-listed through the reverse merger mechanism.

33.     In an April 4, 2011 speech, SEC Commissioner Luis Aguilar cited his

concerns about the use of reverse mergers by China-based firms to accomplish "backdoor

registration," stating:

> In the world of backdoor registrations to gain entry into the U.S.
> public market, the use by Chinese companies has raised some
> unique issues, even compared to mergers by U.S. companies. Two
> important ones are:
>
> • First, there appear to be systematic concerns with the quality of
>   the auditing and financial reporting; and
>
> • Second, even though these companies are registered here in the
>   U.S., there are limitations on the ability to enforce the
>   securities laws, and for investors to recover their losses when
>   disclosures are found to be untrue, or even fraudulent.
>
> I am worried by the systematic concerns surrounding the quality of
> the financial reporting by these companies. In particular, according
> to a recent report by the staff of the Public Company Accounting
> Oversight Board (PCAOB), U.S. auditing firms may be issuing
> audit opinions on the financials, but not engaging in any of their
> own work. Instead, the U.S. firm may be issuing an opinion based
> almost entirely on work performed by Chinese audit firms. If this
> is true, it could appear that the U.S. audit firms are simply selling
> their name and PCAOB-registered status because they are not
> engaging in independent activity to confirm that the work they are
> relying on is of high quality. This is significant for a lot of reasons,
> including that the PCAOB has been prevented from inspecting
> audit firms in China.

34.     On June 9, 2011, the SEC issued an Investor Bulletin warning investors

about investing in companies that enter the public markets through reverse mergers,

citing "instances of fraud and other abuses involving reverse merger companies" and

specifically cautioning investors that "some of the foreign companies that access the U.S.

markets through the reverse merger process have been using small U.S. auditing firms,

some of which may not have the resources to meet its auditing obligations when all or substantially all of the private company's operations are in another country," which it noted "can result in increased risks for investors."

35.     In an accompanying press release, the Director of the SEC's Office of Investor Education and Advocacy further cautioned that "[g]iven the potential risks, investors should be especially careful when considering investing in the stock of reverse merger companies . . . ."

36.     According to a September 29, 2011 news report published by Reuters, the SEC's Chief of Enforcement, Robert Khuzami, stated that the Justice Department was reviewing accounting irregularities at various companies based in China.  The Reuters report further stated that the SEC has established a task force specifically to investigate Chinese companies that enter the U.S. markets via reverse mergers.

37.     Consistent with the concerns raised by SEC Commissioner Luis Aguilar and cited in the SEC's Investor Bulletin, CHNG's Independent Registered Public Accounting Firm at the time that the Related Party Loans were entered into in early 2010 was Frazer Frost, LLP, which has since disbanded.  On December 20, 2010, the SEC entered a cease-and-desist order against one of Frazer Frost, LLP's predecessor entities, Moore Stephens Wurth Frazer & Torbet LLP, arising from auditing improprieties in connection with another China-based company.

**B.     CHNG Is Listed on the NASDAQ and Thereafter Loses Most of Its Value Resulting from Governance-Related Concerns**

38.     CHNG's shares became listed on the NASDAQ Global Select Market in June 2009.

39.     Beginning in early 2010, however, CHNG made a series of disclosures regarding financial and governance improprieties by the Company under Ji's leadership. In early 2011, the Company further sharply curtailed its public disclosures in the months leading up to the announcement of the Proposed Transaction.

40.     As a result, CHNG lost over 80% of its value between January 2010 and the halt of trading on September 21, 2011, severely underperforming both other Chinese companies and its U.S. downstream peers:



**C.      The Company Acknowledges a Series of Governance
         and Internal Control Failures Beginning in Early 2010**

41.      Beginning in early 2010, CHNG reported a series of governance and
internal control failures – including self-dealing by Ji, material transactions not
authorized by the Board, and GAAP violations that severely undermined market
confidence in the integrity of management and quality of the Company's internal
controls.

42.      The Yuxi Acquisition.  On a March 11, 2010 analyst call, in response to
an analyst's question, Ji acknowledged that an entity that he controlled was the recipient
of $19.6 million in cash consideration paid in connection with the 2008 acquisition of
Lingbao Yuxi Natural Gas Co., Ltd. – the Yuxi Acquisition.  The Yuxi Acquisition,
however, was not reported as a related party transaction.

43.      On the analyst call, Ji (through the Company's then-Acting Chief
Financial Officer ("CFO")) asserted three reasons why the cash consideration had been
wired to a company which he controlled: (1) "out of the concern for reasons up from
personal liabilities.  For example, if the owners of the company being acquired . . . would
know that they have such a large amount of money into their account, . . . if they have
some personal liabilities they have to settle these personal liabilities;" (2) "out of some
tax concern by these owners owning this company being acquired;" and (3) "out of some
personal safety concern by this owner selling this Lingbao Yuxi Natural Gas Company."

44.      This explanation prompted analyst concern.  Janney Capital Markets
("Janney") noted in a report later that day, "**Yuxi acquisition raises eyebrows**. We are
slightly skeptical of management's remarks regarding its controversial Yuxi acquisition

in 2008 . . . . This was likely a related party transaction, in our opinion, and should have been disclosed as such." (Boldface in original.)

45.     On November 14, 2011, the Company disclosed that the SEC had initiated an investigation into the Yuxi Acquisition.

46.     The Wang and Juntai Loans.  Two months later, in May 2010, the Company reported in its Form 10-Q for the quarter ended March 31, 2010 that the Company had made loans in the amount of approximately $14.3 million to Shanxi Juntai Housing Purchase Ltd. (the "Juntai Loan") and Ms. Taoxiang Wang (the "Wang Loan"), allegedly parties with whom the Company did not have a prior relationship.

47.     On a May 10, 2010 analyst call, Ji (again, through the Company's then-Acting CFO) explained the Wang and Juntai Loans as a payoff required to obtain regulatory approvals.  Ji stated that "we are facing some difficulty in terms of the challenges in China to business, because currently we are trying to apply and submit our applications for the Phase II and Phase III of the LNG factoring for a increase in capacity. So, there are some necessary paper works and approvals involved in some very senior officials. So we do understand that there are -- this inappropriate for a listed company and we understand there are lines that we cannot cross . . . . So, this is the challenge that we do have. And we're trying our best to deal with this."

48.     An analyst report by Roth Capital Partners ("Roth") the following day cited the loan as "inappropriate and it raises concern over the co's corporate governance and internal controls."

49.     In fact, as later admitted by the Company and discussed below in paragraphs 73 to 75, the Wang and Juntai Loans were secretly made to persons related to Ji.

50.     <u>The Unreported Bank Loan and Unapproved Acquisitions</u>.  Three months later, on August 13, 2010, the Company reported that in February 2010, it had obtained a $17.7 million loan from Pudong Development Bank (the "Unreported Bank Loan"), representing a more than 50% increase in the Company's outstanding debt – but had failed to disclose such loan in its Form 10-Q for the quarter ended March 31, 2010, or as a subsequent event in its Form 10-K for 2009, as required by GAAP.

51.     In addition, in connection with the Unreported Bank Loan, Xi'an Xilan, the Company's VIE, pledged its equipment and vehicles located within China to secure the Unreported Bank Loan and guaranteed the repayment of the Bank Loan.

52.     Also on August 13, 2010, the Company disclosed in its Form 10-Q for the quarter ended June 30, 2010, that "key executives" had made the Wang and Juntai Loans, entered into the Unreported Bank Loan, and proceeded with the acquisition of four natural gas fueling stations, valued at $10.5 million, all "without preapproval from the Company's board of directors . . . ."

53.     These disclosures prompted Roth to downgrade the Company to "sell" on August 19, 2010, based on "concerns over the company's corporate governance and internal controls over financial reporting."  The next day, Rodman & Renshaw placed its rating under review for similar reasons.  A week later, on August 25, 2010, the RedChip equity research firm suspended its price target and rating for the Company based on

"reporting and control concerns," citing the August 2010 disclosures, together with the previously-disclosed Related Party Loans.

54.     Further Unapproved Acquisition.  Six weeks later, on October 1, 2010, the Company disclosed in a Form 10-K/A filing that senior management had also failed to disclose to the Board the $3.6 million acquisition of Hanchun Makou Yuntong Compressed Natural Gas Co., Ltd. in July 2010.

55.     Internal Control Deficiencies.  While the Company's management originally reported that its internal controls were "effective" as of December 31, 2009, the matters identified above led the Company to revise its assessment to find "material weaknesses" as of year-end 2009 and that its "internal control over financial reporting was not effective," as reported in the Company's Form 10-Q filed August 13, 2010.  Each of the Company's periodic reports on Forms 10-K and 10-Q since that date, most recently on November 15, 2011, has reaffirmed the continued existence of "material weaknesses" in its internal controls, rendering its internal controls "not effective."

**D.     Elimination of Meaningful Disclosures
        Concerning CHNG's Business**

56.     Following the series of disclosures concerning management misconduct and GAAP violations listed above, CHNG's management further undermined investor confidence by implementing a near-blackout on meaningful disclosures concerning its business.

57.     Prior to 2011, the Company regularly provided disclosure to analysts and investors regarding the status of major growth initiatives, in particular the Company's the LNG Plant, the Company's joint venture ("JV") with China National Petroleum Corporation ("CNPC"), and the continued expansion of its CNG fueling station business.

58.     Beginning in early 2011, however, the Company sharply curtailed its disclosures, providing vague and uninformative descriptions of the status of its operations and business prospects in both its SEC filings and on analyst calls.

59.     <u>The LNG Plant</u>. The Company's substantial investment in the uncompleted LNG Plant reached $66.8 million as of March 31, 2011 – more than the entire equity value of the Company at its last trading price.  LNG was cited as the Company's "main component of growth" in a January 2010 report from Janney, and as the Company's "key growth driver" in a November 16, 2010 report from Roth.

60.     In 2010, Ji provided specific forecasts regarding the LNG Plant.  For example, on a May 10, 2010 analyst call, he stated (through the then-Acting CFO), "We accounted for approximately 30% of revenue contribution of the full capacity during the third quarter [of 2010] of the LNG factory and about 50% during the fourth quarter [of 2010], because there are a maximum period for the LNG factory which we think is a relatively a uncertainty. So we want to be very conservative in terms of the forecasting."

61.     By contrast, on May 12, 2011, on the last analyst call before the Proposed Transaction was announced, Ji refused to provide any specifics about the LNG Plant. Bode Xu, the then-Acting CFO stated, "We have successfully completed a series of test run in the LNG plant. There's no other preparation for production, it's currently difficult to give a natural estimate on the former launch date but please be assured that we will try our very best to launch the plant as soon as possible."

62.     The Company's subsequent disclosures regarding the LNG Plant, however, strongly suggest that it withheld material information regarding the LNG Plant at the time

the Proposed Transaction was announced and then obscured the true facts in a later English-language disclosure.

63.     On July 19, 2011, the Company issued an English-language press release announcing that it had "successfully completed trial operation of its Jingbian liquefied natural gas ('LNG') plant on July 16, 2011 and has commenced production."

64.     A Mandarin-language press release three days earlier, however, posted on CHNG's Mandarin-language website, www.xltrq.com, stated that the LNG Plant began production on June 25, 2011 – just days before the Proposed Transaction was announced – and that July 16, 2011 was, in fact, the date of a formal ribbon-cutting ceremony to celebrate this milestone, attended by a number of prominent government officials.

65.     The JV.  The Company has been similarly opaque about the status of its joint venture with CNPC, a state-owned exploration and production company.  In its January 20, 2010 report, Janney cited the JV, along with the Company's LNG initiatives, as the Company's principal growth drivers.

66.     Subsequently, Ji indicated that the JV was proceeding.  On a May 10, 2010 analyst call, for example, he stated (through the then-Acting CFO David She ("She")), that "[d]uring the first quarter, our joint venture with CNPC Kunlun Natural Gas Company, although received local government approval to build one CNG compressor station and six fueling stations in Pingdingshan Province, which marks the formal launch of the joint venture between China Natural Gas and CNPC in the region." On the same call, She confirmed that "eight company-owned [and] four joint venture" fueling stations was the Company's "target and best estimate" for the year.

67.     By contrast, on a March 16, 2011 call, Ji's answers regarding the JV were vague and evasive. When asked by analyst Matthew Kantrowitz ("Kantrowitz") of the RedChip equity research firm about whether any new CNG stations were installed in 2010 or would be installed in 2011 and the status of the JV, Ji stated (through a corporate participant), "this is a good question Matthew and we have a good joint venture relationship with CNPC.  And our company is doing well and also we cooperate very well, because CNPC is a state owned company.  So it has very good working attitude. So, we are looking for an incremental base and in associate, we are going to get the other paper works done and granted permission from the government very shortly.  Thank you."

68.     Kantrowitz further inquired, "Okay. So, just to clarify, there is an expectation that the joint venture will continue and that there should be new stations under the joint venture this year?"  Ji's response (through the corporate participant) was, "We are working together and are working together for the, in the future and we work with that.  Thank you."

69.     <u>CNG Business</u>.  Finally, the Company has failed to provide any detail in 2011 regarding expansion of its core CNG fueling station business.  By comparison, during analyst calls on May 10, 2010 and August 16, 2010, the Company stated with specificity the number of new fueling stations that it intended to add during the year.

**E.     The Proposed Transaction**

70.     On June 30, 2011, Ji announced exploration of the Proposed Transaction with a consortium led by Themes Investment Partners, a China-focused private equity firm based in New York.  According to the Company, Ji informed the special committee of the Board responsible for evaluating the Proposed Transaction (the "Special

Committee") that "he intended to work together with the consortium to formulate a proposal to acquire all of the outstanding shares of common stock of the Company that he and his affiliates do not currently own through a going private transaction at a proposed price of $4.25 per share in cash."

71.     The $4.25 offer price was at a discount to CHNG's 30-, 60- and 90-day trailing closing prices, and followed the loss of approximately 50% of the Company's market value since March 2011, and approximately 80% since late 2009.  The Proposed Transaction thus would have enabled Ji to directly profit from the matters described in paragraphs 41 to 69 above.

72.     On September 2, 2011, Ji announced that "the exclusive agreement that he entered into with [Themes] terminated on August 31, 2011.  Themes continues to be interested in a potential investment.  Mr. Ji continues to seek out alternative sources of funding for the going-private transaction."

**F.      Disclosure of the Related Party Loans,
          <u>Replacement of Ji and Halt in Trading</u>**

73.     Finally, on September 21, 2011, the Company announced in a Form 8-K filing that the Forms 10-Q and 10-K issued for 2010 "should no longer be relied upon due to a failure to correctly disclose as a related party transaction" certain loans – the Related Party Loans – that were made to parties related to Ji, and that the Company would be amending such filings to correct this omission.  The Company further announced that the Board had directed the Company to "undertake remediation measures," including the replacement of Ji as CEO and the engagement of certain advisors and adoption of new internal controls.

74.     As the Company admitted, the Related Party Loans violated the Company's own Code of Ethics, which requires its directors, officers and employees to avoid conflicts of interest and to disclose any situation that presents the possibility of a conflict of interest.

75.     The Related Party Loans also violated Section 13(k) of the Exchange Act, which prohibits loans made directly or indirectly to executive officers and directors.

76.     On the same day, NASDAQ announced that it had halted the trading of CHNG shares "for 'additional information requested' from the company" and that "[t]rading will remain halted until China Natural Gas, Inc. has fully satisfied NASDAQ's request for additional information."

77.     As of the date of this Complaint, trading of the Company's shares remains halted.

78.     On October 12, 2011, the Company announced in a Form 8-K filing that the Board had appointed Kang as the Company's CEO and that Ji had resigned as CEO. According to the Form 8-K, "from 2011, Mr. Kang has been vice president of Xi'an Xilan Natural Gas Co., Ltd. ('Xi'an Xilan'), the variable interest entity of one of the Company's major subsidiaries, and is in charge of Xi'an Xilan's business operations. From 2006 to 2010, Mr. Kang served as senior counsel to Xi'an Xilan, responsible for making strategic and business development plans for the Company."  The Company further disclosed that Ji "will continue in his position as Chairman of the Company's Board and his compensation will not change from what was previously disclosed."

79.     Despite previous repeated instances of self-dealing and other governance failures over more than a year, the Board thus responded to the manifest breaches of duty

discussed in the Company's September 21, 2011 Form 8-K by appointing as new CEO a Company insider who had previously served as an advisor to Ji, and by allowing Ji to retain his position as Chairman of the Company, without any reduction in compensation.

**G.      CHNG's Dismissal of Its Counsel**

80.      On November 9, 2011, the Company reported on Form 12b-25 that it would not be timely filing its Form 10-Q for the quarter ended September 30, 2011 "due to the fact that the Company changed its legal counsel recently and engaged its new counsel on November 8, 2011, just one day prior to the filing deadline."

81.      According to publicly-filed correspondence between CHNG and the SEC, and as reported to the undersigned counsel by Delaware counsel for the Company, its principal U.S. counsel prior to November 9, 2011 had been the law firm of Proskauer Rose LLP.

82.      The Company's Delaware counsel, the law firm of Richards, Layton & Finger, also subsequently informed the undersigned that they were no longer representing CHNG.

**H.      The SEC Investigation**

83.      On November 14, 2011, CHNG disclosed for the first time that the SEC was conducting an investigation of the Company.  The Company's disclosure, set forth in the middle of a paragraph on page 58 of the Company's Form 10-Q, states in its entirety: "The SEC has commenced an investigation into the matters surrounding the Wang Loan and the acquisition of Lingbao Yuxi Natural Gas Co., Ltd. The Company is cooperating with the investigation."

## I.      The NASDAQ Delisting Determination

84.      On November 9, 2011, NASDAQ notified the Company that it had

determined to exercise its discretionary authority under Listing Rule 5101 and delist the

Company's securities.  In its Form 8-K filing disclosing the NASDAQ notification, filed

six days later on November 15, 2011, CHNG provided a summary of the reasons given

by NASDAQ for its decision, which consisted of the following:

1. Loans totaling $14.3 million extended by the Company to
   relatives and affiliates of Mr. Qinan Ji ("Mr. Ji"), the
   Company's former Chief Executive Officer, current Chairman
   and largest shareholder for no business purpose, which
   benefitted Mr. Ji's relatives and affiliates;

2. Management's failure to disclose the true nature of the Loans
   to the Board, Audit Committee, a Special Committee of the
   Board established to investigate the Loans, and the Company's
   outside audit firm;

3. the Company's failure to properly and publicly disclose the
   related party nature of the Loans in periodic filings with the
   U.S. Securities and Exchange Commission; and

4. the lack of adequate internal controls related to the Company's
   disclosure and financial reporting.

   In addition, [NASDAQ] Staff stated an additional basis to delist
   for failure to comply with Listing Rule 5630, which requires the
   Company's Audit Committee or other independent body of the
   Board to review all related party transactions.

85.      In its November 15, 2011 Form 8-K, the Company stated that it had

submitted a request to appeal the NASDAQ Staff's determination to the NASDAQ

Hearings Panel.

86.      Under NASDAQ Listing Rules 5815, 5825, and 5830, its final

determination delisting the Company could occur, following appeal, as soon as the

beginning of March, 2012.

**J.**     **Need for Preliminary Equitable Relief**

87.     The imminent prospect that the Company's shares will be delisted by NASDAQ constitutes a threat of irreparable harm warranting (i) the appointment of a temporary receiver for the Company to take the remedial measures needed to preserve the Company's NASDAQ listing, and (ii) entry of an injunction staying delisting by NASDAQ pending appointment of and corrective action by the temporary receiver.

88.     A delisting of the Company's shares would be a catastrophic event for the Company's shareholders: discretionary delisting decisions by NASDAQ under Listing Rule 5101 in the past two years have prompted a median share price decline of 81.3%.

89.     Listing on a major public exchange, such as NASDAQ, assures investors that the extensive listing requirements – concerning financial soundness, stability and transparency – are being satisfied.  By contrast, delisting carries with it a stigma of impropriety, which would be especially pronounced in the case of CHNG, where the delisting proceedings resulted from the exercise of NASDAQ's discretionary authority under Listing Rule 5101, rather than merely from the Company's failure to comply with non-core requirements such as maintaining a minimum bid price or market capitalization.

90.     In addition, most institutional investors are prohibited from owning shares that are not listed on a public exchange, further contributing to a loss in value and liquidity.  Delisted companies are also unlikely to be covered by analysts, thereby depriving investors and prospective investors of professional insight into the Company and further eroding demand for CHNG shares.

91.     Delisting is also often followed by the deregistration of shares, permitting the termination of Form 10-K, 10-Q, 8-K and other SEC-mandated disclosure – termed

"going dark" – effectively depriving shareholders of further meaningful information

regarding the company.

92.     Particularly in the case of a company like CHNG, where management self-

dealing and other governance failures have precipitated delisting, the prospect of unlisted

stock, an absence of SEC disclosure, and no effective check on further self-dealing by

management would result in the shares belonging to Dr. Kousa and other CHNG

investors retaining little value.

93.     The Company's shareholders thus face an imminent threat of irreparable

harm that warrants immediate equitable relief.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure, on behalf of himself and a Class comprised of all

present CHNG shareholders, excluding Defendants and any person, firm, trust,

corporation, or other entity related to or affiliated with any Defendant (the "Class").

95.     This action is properly maintainable as a class action.

96.     The Class is so numerous that joinder of all members is impracticable.  As

of November 8, 2011, CHNG had 21,458,654 shares outstanding, and upon information

and belief, hundreds or thousands of beneficial owners located throughout the United

States and elsewhere in the world.

97.     Questions of law and fact common to the Class predominate over any

question affecting only individual members of the Class, and include, among others:

(a)     Whether circumstances warrant the appointment of an interim

receiver for the Company;

(b)     Whether the Director Defendants have breached their fiduciary duties; and

(c)     Whether Plaintiff and the other members of the Class will be irreparably harmed if the preliminary equitable relief requested by Plaintiff is not granted.

98.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

99.     A class action provides a fair and efficient method for adjudication of the controversy at issue in this action.  The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would confront Defendants with incompatible standards of conduct, and (ii) adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

100.    Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

101.    Preliminary and final equitable relief on behalf of the Class as a whole is appropriate because Defendants have acted on grounds generally applicable and causing injury to the Class.

**DEMAND IS EXCUSED**

102.    Plaintiff has not made demand on the CHNG Board in connection with the matters set forth herein, if any is required, as demand would be futile.

103.    As set forth at length above, the Director Defendants' decision to replace Ji with Kang – a long-time Company insider with close ties to Ji – and to retain Ji as Chairman of the Company constituted, in light of the nature of the Related Party Loans, and the prior instances of self-dealing and other governance failures, gross negligence or willful misconduct by the Board, breaching Defendants' duties of care or good faith, and thereby excusing demand.

104.    In addition, the Director Defendants' conduct in replacing Ji with his long-time advisor and associate, Kang, and retaining Ji as Chairman of the Company, demonstrates a lack of independence from Ji, further excusing demand.

**COUNT I**
**Class Claim for Appointment of Receiver**
**(Against CHNG)**

105.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

106.    The Director Defendants' fraud and gross mismanagement of CHNG has already caused great loss.  Because of these actions and the continuing nature of Defendants' wrongdoing the Company and its shareholders, including Plaintiff, are in imminent danger of suffering further great loss as CHNG's shares face the imminent threat of delisting.  Thus, special circumstances of great exigency exist.

107.    The gross mismanagement, self-dealing and fraud under the leadership of Ji, who remains Chairman of the Board, demonstrate the Company's inability to operate for the benefit of shareholders and warrant the appointment of an independent third party

deemed qualified by the Court to act as temporary receiver of the Company.  A receiver

is required to take the measures necessary to prevent CHNG's delisting, including the

appointment of credible, independent management for the Company, supervision of

remediation measures needed to correct internal control deficiencies, compliance with

NASDAQ listing requirements and requests for information, and reconsideration of

NASDAQ's decision to delist the Company's shares.

## COUNT II
### Derivative Claim for Breach of Fiduciary Duty
### (Against the Director Defendants)

108.    Plaintiff incorporates each and every allegation set forth above as if fully

set forth herein.

109.    The Director Defendants owed and owe CHNG the fiduciary obligations

of care, good faith, loyalty, and candor.  By engaging in the wrongful actions alleged

herein, each of the Director Defendants breached these fiduciary duties.

110.    Unless enjoined by this Court, the Director Defendants will continue to

breach the fiduciary duties owed to CHNG and may cause the Company's shares to be

delisted from NASDAQ, causing irreparable harm to the Company.

111.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the other members of the

Class, and derivatively on behalf of the Company, demands judgment as follows:

A.    With respect to Count I, declaring this action properly maintainable as a

class action;

B.    Appointing a temporary receiver of the Company;

C.       Staying delisting of the Company by NASDAQ pending appointment of and corrective action by the temporary receiver;

D.       Declaring that the Director Defendants have breached their fiduciary duties as alleged herein;

E.       Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

F.       Granting Plaintiff and the other members of the Class such other and further relief as is just and equitable.

Dated:  December 5, 2011

**LIEBESMAN LAW, LLC**

OF COUNSEL:

Ethan D. Wohl
Allie Lin
WOHL & FRUCHTER LLP
570 Lexington Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 758-4000

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman (DE Bar ID #3702)
501 Silverside Road, Suite 2
Wilmington, DE 19809
Telephone: (302) 798-1000

*Attorneys for Plaintiff*